# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| DARRYL LONG, individually and on behalf of all other similarly situated individuals,, <br><br>         **Plaintiff,** <br><br>     vs. <br><br> **CPI SECURITY SYSTEMS, INC.,** <br><br>         **Defendant.** | Civil Action No. 3:12-cv-396-RJC-DSC <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION** |

## I.    INTRODUCTION

In this lawsuit, Darryl Long and eight remaining Opt-In Plaintiffs ("Opt-Ins") (all former employees[1] from two of CPI's five branch locations), claim to be "similarly situated" to approximately 150 CPI technicians with respect to both their job responsibilities and compensation structure. However, CPI's six technician classifications and five branch locations vary greatly in many respects, including their primary job duties *and* their compensation structure. These differences mandate highly individualized and fact-specific inquiries into Plaintiff's claim that CPI improperly classified him and all other technicians as 7(i) exempt[2] employees, and renders this lawsuit inappropriate for class-wide treatment.

Importantly, Plaintiff's claim that CPI has improperly misclassified him and the technicians he seeks to represent as 7(i) exempt is in stark contrast to the U.S. Department of Labor, Wage and Hour Division's conclusions on two separate occasions that CPI properly classified those technicians as 7(i) exempt. (Exh. 2: Snellgrove Decl. ¶ 3.) Moreover, it is clear

---

[1] *See* Exh. 1: current list of Opt-Ins. At one time, this case consisted of ten (10) Opt-Ins; however, one former Opt-In, Andre Banks, elected to opt out and, according to Plaintiff's counsel, Opt-In Mika Elliott is in the process of opting out. Additionally, CPI is contemporaneously filing with this brief a motion to dismiss Opt-Ins Blake Nash, James Berish and Mika Elliott due to their refusal to participate in the Court-approved limited discovery. (DOC. 63.)

[2] Section 7(i) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(i), provides an exemption from the overtime requirements for commissioned employees of a retail or service establishment.

from the record evidence that a direct conflict of interest exists among Plaintiff and some of the putative class he and his counsel seek to represent, thereby prohibiting conditional certification.

Finally, the significant amount of record evidence here mandates that the Court apply a heightened standard for conditional certification, which Plaintiff implicitly conceded in his Motion For Leave to Take Discovery Pursuant to Local Rule 16.1(f). (DOC. 52.) Plaintiff has presented insufficient evidence to meet this standard, or even a lenient standard. Accordingly, Plaintiff's Motion for Conditional Certification must be denied.

## II.     STATEMENT OF FACTS

### Plaintiff's Conclusory And Unsupported Assertion That CPI Technicians "Perform Similar Job Duties And Are Paid The Same" Is Demonstrably Inaccurate.

CPI designs, installs, monitors and services security, fire, CCTV and access control systems for residential and commercial customers in North Carolina, South Carolina and Georgia. (Exh. 3: Gibbey Decl. ¶ 3.) CPI currently has branch offices located in Charlotte, Greensboro and Raleigh, North Carolina; Greenville, South Carolina; and Atlanta, Georgia. (*Id.* ¶ 5.) No two branch locations operate the same. (*Id.*) Branch operations and the management structure vary significantly by location and have evolved over the last three years. (*Id.*) Likewise, the number of technicians, the types of technician, and the daily work performed by each technician vary by branch location and have evolved over the last three (3) years. (*Id.*)

### A.     CPI Has Six Unique Classifications Of Technicians.

Plaintiff, a former Residential Service Technician[3] assigned to the Raleigh branch (Exh. 4: Pl. Dep. 37), asserts that all CPI "Technicians perform similar job duties and are paid the same." (DOC. 43-1, p. 5.) Plaintiff mistakenly groups all CPI technicians whom he seeks to represent into two overly broad categories: "all persons who worked as an installation or service

---

[3] Plaintiff and the remaining Opt-Ins only comprise three of the six technician classifications: Residential Installation Technician, Residential Service Technician and New Construction Technician.

technician." (*Id.*, p. 4.) Plaintiff further asserts that his and the "putative class member's job is to perform non-exempt manual labor work, including installing and/or servicing or repairing CPI's security systems." (*Id.*, p. 5.) In support of these conclusory and incorrect assertions, Plaintiff submitted the declarations of seven Opt-Ins that, on their face, demonstrate that they were not preforming similar job duties. For example, Opt-In Ross declared that his "manual labor" included "servicing and repairing CPI's security systems," (DOC. 43-4: Ross Decl. ¶ 7), while Opt-In McNair declared his "manual labor" merely included "installing" while only "occasionally servicing" but *never* "repairing" CPI's security systems (DOC. 62: McNair Am. Decl. ¶ 7.)

Moreover, ignoring his own deposition testimony (Pl. Dep. 113-114), Plaintiff discounts the clear differences in primary duties between "installation" and "service," *and* he completely ignores that CPI actually has *six* different classifications of technicians: Residential Installation, Residential Service, New Construction, Business Solutions Installation, Business Solutions Service and Upgrade. (Gibbey Decl. ¶ 6.) All CPI technicians are designated within a particular classification and assigned to a particular branch. (*Id.*) Notably, each classification has its own particularized job duties and tasks.[4] (*Id.*) Specifically:

- **Residential Installation Technicians** install one of the three residential security systems CPI currently sells,[5] replace components as needed if CPI takes over a home's security monitoring service from another company, and perform product demonstrations to homeowners following the installation process. (*Id.*; Blinson Decl. ¶ 5; Brown Decl. ¶ 5; Carver Decl. ¶ 7; Douglas Decl. ¶ 6; Forbes Decl. ¶ 4; Hairfield Decl. ¶ 5; Kelly Decl. ¶ 6; B. Williams Decl. ¶ 4;

---

[4] Attached as Exhibit 3 to Plaintiff's Motion are several job postings that he incorrectly references as "job descriptions." (DOC. 43-5) These are neither job descriptions nor job titles; rather, they are intended as broad-based postings designed to generate significant interest and depending upon a particular applicant's experience, skillset and interest, that applicant is channeled to the appropriate technician classification during the application process and if selected, is hired into one of the six specific classifications of technicians. (Snellgrove Decl. ¶ 4.)

[5] CPI has both wired and wireless residential security systems. (Gibbey Decl. ¶ 4.)

W. Williams Decl. ¶ 4.)[6]  A set of drawings or plans is not utilized when installing residential

equipment.  (Gibbey Decl. ¶ 7.)  This is one of the most physically demanding technician jobs,

since it involves completing the entire installation of a security system in a residence.  (*Id.*)

- **Residential Service Technicians** perform diagnostic troubleshooting and resolve

the discovered problems of already-installed security components in customers' residences.  (*Id.*

¶ 8; Aikens Decl. ¶ 4; Brannock Decl. ¶ 5; Cooper Decl. ¶ 5; Dioguardo Decl. ¶ 5; J. Evans Decl.

¶ 3; Gimbel Decl. ¶ 4; Hewitt Decl. ¶ 5; Pompey Decl. ¶ 6; Van Metre Decl. ¶ 6.)[7]  Diagnostic

troubleshooting requires greater technical knowledge of CPI's security systems than is required

to install a CPI security system.  (Gibbey Decl. ¶ 8.)  Unlike their counterparts, the duties

performed by this classification, while less physically demanding, are more mentally

challenging.  (*Id.*)  Residential Service Technicians are assigned more jobs per day than

Residential Installation Technicians.  (*Id.*)

- **Business Solutions Installation Technicians** install new security and monitoring

components sold by CPI to large commercial or business customers.  (*Id.* ¶ 9; Exh. 7: Holmes

Decl. ¶ 6.)  These are custom jobs and, unlike residential installations, are installed following a

CAD or blue-print drawings.  (Gibbey Decl. ¶ 9.)  CPI's commercial line of security and

monitoring related products is more sophisticated and expansive than its residential product line.

(*Id.*)  Therefore, Business Solutions Installation Technicians not only install a more

comprehensive product line, but they must also have a working knowledge of fire codes, the

ability to follow drawings during the installation process, and be able to use more tools to

perform their job.  (*Id.*)  Additionally, the installation process is unlike that performed in a

---

[6] *See* Exh. 5: Declarations of Residential Installation Technicians.
[7] *See* Exh. 6: Declarations of Residential Service Technicians.

typical residence given the differences in the construction process, construction materials and building codes. (*Id.*) This classification also drives a larger vehicle. (*Id.*)

- **Business Solutions Service Technicians** troubleshoot and repair the more sophisticated and expanded product line of security and monitoring components sold to commercial customers. (*Id.* ¶10.) Given the complexity of some of the commercial components, a higher level of expertise and knowledge is required to perform this job than other classifications. (*Id.*) Unlike for Residential Service, CPI guarantees a service response time for its commercial customers and the ability to meet this demand is a job expectation unique to this classification. (*Id.*)

- **New Construction Technicians**[8] work in a completely different environment than other technician classifications. As the job title suggests, they perform their tasks during the construction phase **of** a residential home. (*Id.* ¶ 11.) They perform no work on the commercial side of CPI's business. (*Id.*) This classification does not actually install security systems; rather, they run various types of wire ranging from security, low voltage, Cat5, cable, phone, and CCTV that can later be connected to various components, and they also run central vacuum tubing. (*Id.*)[9] Unlike other tasks performed in residences, blueprints or drawings are utilized. (*Id.*) Given the different work environment and product line, this classification uses a wide assortment of tools and a bigger vehicle to transport the extra equipment. (*Id.*) Unlike some of the classifications, the primary customer base is not a residential homeowner but rather a builder or a superintendent. (*Id.*)

---

[8] New Construction Technicians are also commonly referred to as Pre-Wire Technicians.

[9] In the Charlotte branch due, in part, to the number of construction jobs, there is a subset of a New Construction Technician commonly referenced as an "activation technician." (Gibbey Decl. ¶ 12.) This subset's duties consist of hooking up and testing the equipment to the prewiring but does not involve "pulling wire." (Exh. 8: Tellier Dep. ¶ 41-42.) This is a difference between the primary duties of two Opt-Ins, McNair and Tellier, both classified as New Construction Technicians. McNair never performed "activation technician" duties, while Tellier and other New Construction Technicians identified by Tellier did. (Tellier Dep. 60.)

- **Upgrade** is a new classification of specialized installer that replaces or upgrades obsolete equipment, devices or hardware in residences.  (*Id.* ¶ 13.)[10]

Critically, no two individual technicians, even within the same classification, necessarily perform the same duties.  (*Id.* ¶ 14.)  Depending on numerous factors, including a particular technician's experience, level of training and branch location, some CPI technicians perform tasks across various classifications, while others perform few, if any, tasks typically associated with other classifications.  For example, some Residential Installation Technicians, when the need arises, perform service calls commensurate with their specific level of expertise.  (Gibbey Decl. ¶ 14; Blinson Decl. ¶ 7; Douglas Decl. ¶ 6; Hairfield Decl. ¶ 9; Kelly Decl. ¶ 4; B. Williams Decl. ¶ 6.)  Opt-In McNair, a former Charlotte branch New Construction Technician, on the rare occasion performed "service calls" but only those limited to replacing yard signs and replacing batteries.  (Exh. 11: McNair Dep. 81-82.)  While technically a "service call," it is a far cry from the diagnostic troubleshooting and repair knowledge and expertise required of a Residential Service Technician.  (Gibbey Decl. ¶ 8.)

CPI training among the classifications varies greatly.  For example, all newly hired Residential Installation Technicians are placed in a test lab environment where training on how to install CPI's current residential security systems is reviewed.  (Exh. 10: Gibbey Dep. 22-23.) The training is individually tailored to that individual's prior level of experience and expertise and can last up to three days.  (*Id.*)  In contrast, Residential Service Technicians go through a completely different lab training environment that has nothing to do with installation of equipment but rather, involves the specific job duties of that classification:  diagnostic troubleshooting and training on "legacy" equipment – such as products CPI installed over ten

---

[10]The Upgrade Technician classification did not exist during Plaintiff's employment or any of the Opt-In's employment.

years ago. (Gibbey Dep. 26-27.) On-the-job training is also conducted and is classification specific (*e.g.*, only senior New Construction Technicians train new New Construction Technicians, etc.).

Additionally, CPI evaluates technicians only within the same classification and not among classifications. (Gibbey Decl. ¶ 15.) Moreover, the matrix used varies by classification. (*Id.*)

### B. CPI Has Separate And Particularized Compensation Plans For Each Of Its Classifications.

CPI also has separate and particularized compensation plans for each of its classifications.[11] For example, CPI classifies many of its Residential Installation, Residential Service, New Construction, Business Solutions Service, and Upgrade Technicians as 7(i) exempt; however, this exemption is not universally applied and, as a result, even within these classifications, some are or have been classified as non-exempt. (Gibbey Decl. ¶ 26.) For example, *all* newly hired technicians are considered non-exempt and receive hourly "training pay" for the duration of their individualized training period. (*Id.* ¶ 17.) The length of training an individual receives is wholly dependent upon that individual's level of prior experience and the learning curve of that particular trainee. (*Id.*) Moreover, until recently, all Atlanta, Georgia technicians, regardless of classification, were paid hourly. (*Id.*) Additionally, for the past three years, CPI classified a Residential Service Technician who worked in the Asheville, North Carolina area as non-exempt. (*Id.*) Lastly, CPI classifies *all* of its Business Solutions Service Technicians as non-exempt. (*Id.*)

Significantly, CPI also utilizes separate and particularized compensation plans for each of its classifications:

---

[11] Each of the 7(i) compensation plans, while similar in structure or format, contain components and formulas unique to each technician classification. (Gibbey Decl. ¶ 18.)

- **Residential Installation Technicians** receive a proportional retail value of the systems installed, as well as additional components that are sold and added to systems, and receive additional commission on any upsells. (*Id.* ¶ 20; Blinson Decl. ¶ 15; Brown Decl. ¶ 11; Carver Decl. ¶¶ 10-12; Douglas Decl. ¶¶ 11, 13; Forbes Decl. ¶¶ 7-8; Hairfield Decl. ¶¶ 14, 16; Kelly Decl. ¶ 14; B. Williams Decl. ¶¶ 12, 15, 17; W. Williams Decl. ¶¶ 12-13, 15.) The commission earned directly correlates to that individual product's final cost to the consumer. (*Id.*) The compensation plan for this classification does not contain a service call pay component. (*Id.*)

- **Residential Service Technicians** receive the entire value of each service call pay.[12] (Gibbey Decl. ¶ 20 ; Aikens Decl. ¶ 13; Brannock Decl. ¶ 12; Cooper Decl. ¶ 12; Dioguardo Decl. ¶ 14; Evans Decl. ¶ 7; Gimbel Decl. ¶ 11; Hewitt Decl. ¶ 15; Pompey Decl. ¶ 10; Van Metre Decl. ¶ 11.) Additionally, this classification receives additional commissions generated by any upsells. (Gibbey Decl. ¶ 21; Aikens Decl. ¶ 14; Dioguardo Decl. ¶ 16; J. Evans Decl. ¶ 8; Gimbel Decl. ¶ 12; Hewitt Decl. ¶ 15; Pompey Decl. ¶ 11; Van Metre Decl. ¶ 11.) Finally, there is no installation component to this classification's compensation plan. (Gibbey Decl. ¶ 21.)

- **Business Solutions Installation Technicians** receive a proportional retail value of the type of system installed as well as additional components that are sold and added to systems and receive additional **commission** on any upsells. However, the proportional retail values are different than those of a Residential Installation Technician given the different and expanded product lines. (*Id.* ¶ 22.) There is no service call pay component in this classification's compensation plan. (*Id.*)

---

[12] The service call pay is higher in Greensboro than the other branches to reflect the greater distances/lower customer density of the Greensboro market. (Gibbey Decl. ¶ 21.)

- **Business Solutions Service Technicians** are paid an hourly wage and paid time and one-half for all hours worked over 40 hours in a given work week. (*Id.* ¶ 23.) The hourly rate of pay is **dependent** upon factors such as experience and length of service, which vary among the Business Solutions Service Technicians. (*Id.*)

- **New Construction Technicians** receive a proportional retail value of the central vacuum system package trim run, the particular wire trim run, or the security system wire trim package run during the construction process. (*Id.* ¶ 24.) Additional commissions are earned on **products** sold to customers on their expanded product line, such as central vacuum or running speaker wire. (*Id.*) There is no service call pay component in this classification's compensation plan.

- **Upgrade Technicians** receive **the** retail value of equipment installed as well as additional commissions on any upsells. (*Id.* ¶ 25.)

As noted above, at times, CPI technicians perform tasks across the various classifications. (*See*, *e.g.*, Blinson Decl. ¶ 7; Douglas Decl. ¶ 6; Hairfield Decl. ¶ 9; Kelly Decl. ¶ 4; B. Williams Decl. ¶ 6.) Technicians who perform tasks across the various classifications are not paid pursuant to a single compensation plan. (Gibbey Decl. ¶ 27.) Instead, they are paid pursuant to the specific compensation plan commensurate with the particular task they are performing. (*Id.*) Thus, in any given day, a particular technician can be subject to numerous pay plans. For example, when installing a residential security system, a Residential Installation Technician would be paid according to the "Installation Technician/Residential Comp Plan." (*Id.*) However, if assigned a minor residential service call later that same day, the technician would be paid pursuant to the "Service Installation/Residential Technician Comp Plan." (*Id.*)

Finally, CPI technicians vary widely in the amount of hours that they work. Even the declarations submitted by Plaintiff demonstrate this. (*Compare, e.g.*, Doc 43-4; Milam Decl. ¶ 12 *and* DOC. 43-4: McNair Am. Decl. ¶ 11.) Moreover, unlike the 60-plus hours alleged by Plaintiff and some of the Opt-Ins, many CPI technicians work less, averaging between 50 to 60 hours per week. (Snellgrove Decl. ¶ 5; Hewitt Decl. ¶ 24; Pl. Dep. 151-52.) Individual technician's hours vary greatly from week to week depending on a host of factors including their willingness in any week to take on additional work, the length of time that particular installations or service calls might take, the overall volume work, and the number of available technicians coupled with a particular technician's skill set. (Gibbey Decl. ¶ 28.)

**C.**     **Branch Operations Vary Dramatically From Branch To Branch.**

CPI assigns each of its technicians to a specific CPI branch. (*Id.* ¶ 29.). The structure of CPI's branches has changed over the years and varies dramatically, as do the number and type of technician classifications assigned to a particular branch. (*Id.*) Not all branches have all six classifications; in fact, only the Charlotte branch has all six technician classifications assigned to it. (*Id.*) This depends, in part, upon the type of work generally performed or not performed in a particular market. (*Id.*) For example, in the Greenville market area, CPI typically does not have large commercial customers. (*Id.*) Therefore, if a large commercial installation job was required in Greenville, a Business Solution Installation Technician from Charlotte would perform the installation.[13] (*Id.*)

Because Raleigh and Greensboro are smaller branches than Charlotte and do not have every classification, technicians in those branches more frequently operate across different classifications than in Charlotte. (Gibbey Decl. ¶ 30.) Importantly, tasks a particular technician

---

[13] Depending upon size and complexity, a Greenville Residential Installation Technician, for example, could perform a small commercial installation job. This, of course, would vary depending upon the specific particulars of the job and the skill of the technician. (Gibbey. Decl. ¶ 29.)

may perform outside his particular classification are unique to that technician's particular expertise and skill set. (*Id.*) Finally, there are some tasks that only a specific classification can perform. For instance, large commercial installations can only be performed by a Business Solutions Installations Technician, and, likewise, a large commercial service call is only serviced by a Business Solutions Service Technician. (*Id.*)

How technicians are assigned work also varies among the branches. While "service" calls are dispatched out of Charlotte Corporate, a branch Operations Manager reviews the routes to ensure that the routes match the assigned technician's requisite ability and skillset for the particular service call assignments and, if necessary, makes adjustments to the route. (Gibbey Dep. 65-66.) Each Operations Manager is responsible for assigning installation jobs. (*Id.* at 63.) For example, residential installation jobs are assigned by degree of anticipated difficultly to those technicians with the requisite skills. (Gibbey Decl. ¶ 31.)

## III. LEGAL ARGUMENT

### A. This Case Is Not Appropriate for Conditional Certification.

The fundamental question raised by Plaintiff's Motion is whether this Court will assist Plaintiff in notifying approximately 150 current and former CPI technicians[14] across North Carolina, South Carolina and Georgia of the pendency of this action and invite them to opt-in if they so choose. Although the FLSA does not expressly authorize the judicial involvement that Plaintiff seeks, the Supreme Court placed the decision whether to use such a process squarely within the district court's sound discretion. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (finding notice to similarly situated claimants advisable where it promotes "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity.") (emphasis added).

---

[14] Snellgrove Decl. ¶ 6.

Whatever the merits of Plaintiff's individual overtime claim, there is simply no way his overtime theory could be adjudicated on behalf of everyone who was employed by CPI as a technician in North Carolina, South Carolina and Georgia. As discussed below, Plaintiff and the other opt-ins are not "similarly situated" to all of the other CPI technicians. To the contrary, their claims require individualized factual inquiries.

    1.     **This District has adopted the "Intermediate Approach" when the parties have engaged, as they have done here, in pre-conditional certification discovery.**

Pursuant to Plaintiff's own motion, Plaintiff was offered the opportunity to conduct discovery on the issue of conditional certification. In doing so, Plaintiff elected to conduct three depositions: CPI's Director of Operations, CPI's current Vice President of Human Resources and CPI's former Director of Human Resources. Plaintiff also submitted seven (7) declarations in support of his Motion for Conditional Certification. Defendant also conducted pre-conditional certification discovery by deposing Plaintiff Long and six of the Opt-Ins (the other two refused to appear for deposition). Defendant likewise submits forty-eight (48) declarations supporting its opposition to Plaintiff's Motion for Conditional Certification.[15]

Given the record evidence, this district's precedence, as well as Plaintiff's own rationale for seeking pre-certification discovery, this Court should adopt the intermediate standard to analyze Plaintiff's Motion for Conditional Certification. *See Blaney v. Charlotte Mecklenburg Hospital Authority*, 2011 U.S. LEXIS 105302 (W.D.N.C. Sept. 2011). Under this approach, a court considers evidence developed to date, and the plaintiff must overcome a more stringent standard in order to obtain conditional certification. *See Bunyan v. Spectrum Brands, Inc.*, 2008 U.S. Dist. LEXIS 59278, at *11; *see also*, *Villanueva-Bazaldua v. Trugreen Ltd. Partners*, 479 F.Supp.2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an

---

[15] *See* Exh. 12: Defendant's supporting declarations.

intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, 2007 U.S. Dist. LEXIS 91989, at *6 (W.D. Mich. Dec. 14, 2007).

  **2.** **<u>Even if the "lenient standard" applies, Plaintiff fails to demonstrate conditional certification is warranted.</u>**

   Plaintiff urges the Court to apply the more lenient standard, yet only cites to inapposite cases where the parties conducted little or no discovery prior to motion for conditional certification. (*See* Pl.'s Mot., Sect. III.B.) Regardless, even if the Court were to apply the lenient standard, Plaintiff's Motion for Conditional Certification must be denied. While "'not onerous,' . . . [the lenient ] standard] is . . . 'not invisible.'" *Purdham v. Fairfax County Public Schools*, 629 F.Supp.2d 544, 548 (E.D. Va. 2009) (quoting *Parker v. Rowland Express, Inc.*, 492 F.Supp.2d 1159, 1164 (D. Minn. 2007)). Under the lenient standard, Plaintiff still bears the burden of establishing that the proposed class members are similarly situated and that notice is appropriate. *See Purdham*, 629 F. Supp. 2d at 548. District courts therefore should not facilitate notice unless the plaintiffs meet their burden of demonstrating that a class of similarly-situated employees who have been aggrieved exists. *Id.* at 547-48. Indeed, federal courts have routinely denied requests for conditional certification where, as here, the Plaintiff attempts to certify a broad class based only on the conclusory allegations of a few former employees. *Sandate v. Makotek, LLC*, 2006 U.S. Dist. LEXIS 70596 at *1-5 (M.D. Fla. Sept. 28, 2006) (attempt to certify class of cable technicians where plaintiffs were employed by one of two branches of the company and failed to show that any other technicians were interested in joining the suit). Likewise, courts routinely hold that generally identical declarations of the type submitted by Plaintiff have limited evidentiary value. *Carruthers v. Keiser Sch., Inc.*, 2010 U.S. Dist. LEXIS 133186, at *6-7 (M.D. Fla. Dec. 3, 2010) ("Plaintiff's declarations are largely the same

declaration signed by seven different employees, with few minor differences. They fail to establish through detailed factual allegations that Plaintiff's position is similar to the positions held by the potential class members with respect to job requirements and pay provisions.").

For the reasons detailed below, Plaintiff has failed to demonstrate that conditional certification is appropriate under either the intermediate or lenient standard.

### B. Plaintiff and the Proposed Class Are Not Similarly Situated As Their Responsibilities And Compensation Plans Differ Greatly Depending On A Number Of Factors, Necessitating Individualized, Fact-Specific Inquiries.

Plaintiff must go beyond conclusory allegations and show that he and the putative class he wishes to represent are victims of a common decision, policy or plan which results in widespread FLSA violations. *Shabazz v. Asurion Ins. Serv.,* 2008 U.S. Dist. LEXIS 29696, at *6 (M.D. Tenn. April 10, 2008); *White v. MPW Indus.*, 236 F.R.D. 363, 366-367 (E.D. Tenn. 2006). If Plaintiff cannot illustrate how he and the "putative class members were together the victims of a single decision, policy or plan" that violates the FLSA, the court should not conditionally certify the class. *Mooney v. Aramco Servs Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Nor is this burden of proof satisfied by conclusory allegations to the effect that the Plaintiff is similarly situated to putative class members. *Conerly v. Marshall Durbin Co.*, 2007 U.S. Dist. LEXIS 85994, at *23 (S.D. Miss. Nov. 5, 2007).

In the instant case, Plaintiff's motion is entirely based on two allegations: (1) all CPI technicians performed similar job duties and were paid the same; and (2) CPI treated all of its technicians as 7(i) exempt from the FLSA's overtime provisions. (DOC. 43-1, pp. 14-15.) A review of the record reveals that Plaintiff's claims are unsupported and insupportable. In fact, CPI technicians perform different duties, are paid differently and are not all classified as exempt under 7(i).

### 1. Technicians do not uniformly perform the same duties.

As set forth above, all CPI technicians are designated as one of CPI's six particular classifications. Significantly, the record evidence demonstrates a vast disparity in the primary duties, skills, equipment used, and numbers of hours worked among these six classifications. Some classifications are primarily responsible for diagnostic troubleshooting, while others are responsible for product installation; not to mention the work environment differs. (Gibbey Decl. ¶ 15.) As a result, these different classifications receive vastly different training to enable them to perform their distinct tasks. (*Id.*) Moreover, each classification has its unique skillset, expertise and knowledge required to perform that classification's specific and unique primary job duties that also varies and is dependent upon whether the classification serves CPI's residential or business customers. (*Id.*) It is these differences that explain why CPI ranks and reviews its technicians by their specific classification and pursuant to that classification's unique production matrices. (*Id.*)

In glaring contrast to Plaintiff's allegation that all technician job duties are similar is the abundant record evidence demonstrating the opposite conclusion. In fact, no two individual technicians irrespective of their classification necessarily perform the same duties. (*Id.* ¶ 14.) Some technicians perform little or no work outside of their specific classification. (*Id.*; Aikens Decl. ¶ 7; Brown Decl. ¶ 7; Dioguardo Decl. ¶ 8; Evans Decl. ¶ 5; Gimbel Decl. ¶ 6; Hewitt Decl. ¶ 8.), while other technicians perform a wider range of duties that cut across several technician classifications (Blinson Decl. ¶ 7; Douglas Decl. ¶ 6; Hairfield Decl. ¶ 9; Kelly Decl. ¶ 4; Van Metre Decl. ¶ 6.) For example, Opt-In McNair, a former Charlotte branch New Construction Technician, on the rare occasion would be assigned a "service call," but that call was limited to merely putting in a yard sign or replacing a battery. (McNair Dep. 82-83.) In comparison, Opt-In Tellier, a Charlotte branch New Construction Technician, also on occasion

was assigned service calls but had the training and experience to perform a wider variety of service type calls. (Tellier Dep. 57.) Such differences among technicians result from a variety of individualized factors such as a particular technician's experience, skillset, branch, and the number of technicians coupled with availability and the make-up of a technician classification at a given branch location. (Gibbey Decl. ¶ 17.)[16]

### 2. There is no common pay plan that applies to the entire putative class.

Plaintiff attempts to paint a broad brush with respect to how CPI pays its six classifications by incorrectly stating that "all technicians are primarily paid on piece rate bases.[17] (DOC. 43-1, p. 5.) However, as outlined above, CPI has six different compensation plans for its six different classifications, and even treats one classification – Business Solutions Services – as non-exempt.[18] (Gibbey Decl. ¶ 17.) Importantly, even within the classifications that CPI has designed as 7(i) exempt, that exemption is not universally applied and some individual technicians are or have been identified as non-exempt and paid by the hour. (*Id.*) As a matter of law, the FLSA does not treat employees classified as non-exempt from the FLSA's overtime provisions to be similarly situated to employees classified as exempt. *See, e.g., Romero v. H.B. Auto. Group, Inc.*, 2012 U.S. Dist. LEXIS 61151 (S.D. N.Y. May 1, 2012) ("here a collective action contains a mix of employees, some of whom are classified exempt from the FLSA's requirements, and some of whom are classified as non-exempt, there is no factual nexus between the collective action members' situations, and conditional certification is not appropriate"); *Tussing v. Quality Res. Inc.*, 2009 U.S. Dist. LEXIS 110190, at *8-9 (M.D. Fla. Nov, 25, 2009)

---

[16] Plaintiff and the Opt-Ins concede that they cannot dispute these differences, and in fact have no information regarding the duties of technicians in other offices and/or other classification. (Tellier Dep. 40, 63-64, Exh. 13: Morris Dep. 43-44; Exh. 14: Foreman Dep. 67-69; Exh. 15: Ross Dep. 210-212.)

[17] CPI considers those technicians designated as 7(i) exempt as paid on a commission basis (Gibbey Dec. ¶16.) which ultimately is what the U.S. DOL would have had to conclude that these technicians meet the exemption on two separate occasions.

[18] Business Solutions Service Technicians are paid by the hour, and the hourly rate varies depending upon the technician's individual experience and length of service. (*Id.* ¶ 23.)

(denying conditional certification since mixing both exempt and non-exempt employees in a class is overbroad).

A fact-intensive individualized review of each technician's pay needed to determine whether CPI has violated the FLSA is directly at odds with conditionally certifying this case. Even at hire these differences are apparent, since the individualized training periods tailored specifically for each new technician led to different compensation even among technicians within the same classification. (Gibbey Decl. ¶ 17.) Newly hired technicians receive training pay and are considered non-exempt. (*Id.*) The duration an individual remains in the individual training classification is wholly dependent upon how well he or she progresses in training. (*Id.*) Moreover, a technician may be released from training only to return shortly thereafter upon realization that the technician was released too early. (*Id.*)

Additionally, each technician's pay is subjected to daily variation by their respective Operations Manager both in terms as to how jobs are assigned and the number of additional "units"[19] that a particular technician is provided. (*Id.* ¶19.)

Even at a macro level, the record evidence demonstrates that vast differences exist among each of the classifications' compensations plans, even between the overly broad groupings of installation and service described by Plaintiff. Residential Installation Technicians generally receive a proportional retail value of the type of systems installed while Residential Service Technicians are paid a fixed value for each service call. (Gibbey Decl. ¶ 26.) While this singular difference demonstrates the absence of similarly situatedness, when one takes even a cursory review of the compensation plans among the classifications, it becomes abundantly clear,

_____

[19] Units are additional compensation that technicians *can* receive, such as for excessive drive time. (Gibbey Decl. ¶ 19.) While there are guidelines for providing units, each Operations Manager determines when, how many and under what circumstances to provide them. (*Id.*)

that CPI has separate and particularized compensation plans for each of its classifications. For example, there are distinct differences in the proportional value that Residential Installers receive for installing one of the three residential product lines in comparison to the expanded commercial line for Business Solutions Installations. (*Id.*) Likewise, a Residential Service Technician is paid a value of the service call while a Business Solutions Service Technician is paid hourly. (*Id.*)

Moreover, Plaintiff ignores the undisputed fact that no two individual technicians, irrespective of their classifications, necessarily perform the same duties and at times perform duties across various classifications. Even those technicians cutting across classifications are not always paid the same. For example, Opt-In McNair, on those rare occasions he performed a "service call," was not allowed to upsell and thus not subject to the Residential Service compensation plan. (McNair Dep. 82.) In comparison, Opt-In Milam could upsell when performing service work. (Milam Dep. 82.) In sum, the record evidence is clear that no two technicians are necessarily operating under the same compensation standards.

Ultimately, all of the above facts point to one simple truth: an individualized analysis will be needed to assess the claims of Plaintiff and any other members of the putative class. The question of each branch's specific practices, the duties performed by specific CPI technicians, and the manner in which those technicians were compensated – inquiries central to this lawsuit – will involve fact-specific and highly individualized inquiries that simply are not appropriate for class treatment. *See Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, at *21; *see also Purdham*, 629 F. Supp. 2d at 552 (denying conditional certification under lenient standard where trial would require individualized fact determinations); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (denying motion for conditional certification where "each claim would require extensive

consideration of individualized issues of liability and damages"); *Briggs v. United States*, 54 Fed. Cl. 205, 206 (2002) (denying motion to conditionally certify collective FLSA action where "the determination of entitlement [to overtime] will be highly fact-specific as to each plaintiff").

   **C.     Conflicts Exist Among Plaintiff's Counsel, Plaintiff And The Putative Class Prohibiting Conditional Certification.**

   Plaintiff is not similarly situated to CPI's installation, service and other technicians whom he seeks to represent because his theory of relief would squarely pit his interests against theirs. Because Plaintiff and his counsel would be required to subordinate the interests of some class members to Plaintiff's own interests and those of other members of the class in order to prevail, they cannot adequately represent the proposed class.

   Although the requirement that a representative plaintiff and his counsel "adequately represent" the class is not present to the same degree in an FLSA collective action as it is under a Rule 23 class action, "[t]his does not mean, however, that adequacy of the plaintiff's counsel is irrelevant.   FLSA collective actions are representative actions and, 'given that individuals who opt-in to this proceeding will most likely be represented by the named-plaintiff's counsel, the court has an equitable interest in ensuring that they are adequately represented.'"   *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1315 (M.D. Ala. 2002) (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 263 (S.D. N.Y. 1997)) (excluding one of two groups of employees from conditionally certified class where there was a conflict between the groups' interests and their job duties were dissimilar).   Because the relief Plaintiff seeks is not aligned with the interests of the individuals whom he hopes to represent (including the interests of several of the opt-in plaintiffs), he cannot represent them adequately and, therefore, the equities weigh against granting Plaintiff's motion.

Plaintiff, through this action, seeks a determination that CPI's current pay plans for technicians are unlawful and that technicians should be paid "one and one-half times the regular rate of pay for all hours worked over forty (40) hours per workweek." (Am. Comp., DOC. 21 ¶¶ 36-40, 42.) This relief is contrary to the interests of current CPI employees. As shown by declarations submitted by numerous current CPI technicians in various roles, they believe that they are appropriately paid, and prefer CPI's current pay plans because those plans reward them for doing fast, efficient work and providing customers with services and products they need. As a result, they oppose any effort to base technicians' pay solely on the number of hours worked per week; as such a system would not offer them the same opportunities. (*See* Abbot Decl. ¶¶ 6, 7; Banks Decl. ¶¶ 6, 7; Brannock Decl. ¶¶ 6, 7; Bree Decl. ¶¶ 6, 7; Carbajal Decl. ¶¶ 6, 7; Chavez Decl. ¶ 7; Crimmins Decl. ¶¶ 6, 7; Dalpoggetto Decl. ¶¶ 6, 7; Doty Decl. ¶¶ 6, 7; Fagnani Decl. ¶¶ 6, 7; Goodwin Decl. ¶ 6; Hawkins Decl. ¶¶ 6, 7; Henderson Decl. ¶ 6; Hernandez Decl. ¶¶ 6, 7; Jenkins Decl. ¶¶ 6, 7; Paige Decl. ¶¶ 6, 7; Parker Decl. ¶¶ 6, 7; Piser Decl. ¶¶ 6, 7; Roman Decl. ¶¶ 6, 7; Sigmon Decl. ¶¶ 6, 7; Smith Decl. ¶¶ 6, 7; Tew Decl. ¶¶ 6, 7; Thomas Decl. ¶¶ 6, 7; Vogler Decl. ¶¶ 6, 7; West Decl. ¶¶ 6, 7; Wharton Decl. ¶¶ 6, 7.)

During his deposition, Plaintiff acknowledged that his requested relief would require CPI to change its pay plans (Pl. Dep. 181-182), and that he believes overtime should be paid based on hours worked (Id. 188-190.) At the same time, he admitted that some current employees would prefer to retain plans based on "piece pay" rather than change to hours-based plans. (*Id.* 190-192.) This testimony highlights the very conflict that makes him inadequate as a class representative: he wants to force CPI to change its pay plans; he seeks to represent all current installation, service and other technicians; and he acknowledges that (as confirmed by the

declarations discussed above) some of those current technicians would prefer to retain the current plans as deemed lawful by the U.S. Department of Labor.

This conflict parallels one that the district court found to preclude certification of a collective action under Section 216(b) in *Wilson v. Allegheny Intl., Inc.*, 1986 U.S. Dist. LEXIS 26270 (N.D. Ill. Apr. 25, 1986).  In that case, plaintiffs alleged that their employer, by forcing them to choose between quitting their jobs and surrendering to a lump sum option under a retirement plan, violated the Employees Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").  The plaintiffs sought certification of a Rule 23 class for their ERISA claims, as well as certification of a Section 216(b) for their ADEA claims.[20]  The court concluded that conflicts between the named plaintiffs and current employees precluded the named plaintiffs from fairly and adequately protecting the interest of the ERISA class.  Among other considerations, the court found that current employees "may be completely satisfied with the benefits provided" under the current retirement plan and, therefore, "to the extent that the relief sought by named plaintiffs [that is, reinstating the prior plan] will disrupt those benefits, it is conflicting and antagonistic to the interests of present employees."  *Id.* at *6-7.  As the court reasoned, since there was "at least a possibility" that the present employees had an interest in retaining their retirement benefits as they existed, "any attempt to alter those benefits would be contrary to their interest. Accordingly, named plaintiffs, who seek to do so, cannot fairly and adequately represent the interests of present employees."  *Id.* at *7-8.  Turning to the plaintiffs' motion to certify an ADEA collective action, the court observed that "the certification requirements of Rule 23 do not apply," and that the "similarly situated" standard of Section 216(b) was "less stringent than the

---

[20] The standards of Section 216(b) are incorporated into the ADEA by 29 U.S.C. § 626(b).

requirements of Rule 23"; nonetheless, it concluded that because of the conflict discussed above, the plaintiffs were not similarly situated to the current employees whom they sought to represent. (*Id.* at 9.) Accordingly, it denied their motion and refused to certify the class.

The same logic applies here to an even greater degree. Unlike in *Wilson*, where a theoretical conflict existed between current and former employees, numerous current employees here have come forward and made sworn statements stating their preference for the current plans and their opposition to the changes that Plaintiff seeks—changes which the current employees believe would provide them with fewer opportunities than they have under the current plans.

Moreover, the non-theoretical nature of these conflicts is highlighted by differences that already exist between Plaintiff and the other former employees who have consented to "opt in" to this case. As noted, Plaintiff seeks to force CPI to change its pay plans to an hours-based overtime system. (Pl. Dep. 188-190.) Similarly, Opt-In Milam wants the plans changed and payment of "time and a half" based on average hourly income. (Milam Dep. 80.) Opt-In McNair also seeks payment of hourly time-and-a-half overtime for himself, but unlike Plaintiff and Opt-In Milam, he does not seek to force changes to CPI's current plans. (McNair Dep. 29-30.) Opt-In Foreman, on the other hand, seeks to force CPI to make changes to the current plans, but unlike Plaintiff and Opt-Ins Milam and McNair, he believes that overtime should be calculated based on average daily wages. (Foreman Dep. 72-73, 103.) The conflict between these varied positions is obvious.

Setting aside that the Opt-Ins' differing views with respect to whether CPI's current pay plans should be changed to align with Plaintiff or with the numerous current employees who submitted declarations, their differences with respect to how overtime should be calculated pit them against each other with respect to the monetary relief they seek. That is, under an

hours-based overtime system, some of the Opt-Ins will receive less than they would under their preferred system based on daily averages; under a system based on daily averages, some will receive less than they would under their preferred hours-based system. By advocating for one position over another, Plaintiff and his counsel reduce the potential recovery that some of the Opt-Ins would receive. Plaintiff and his counsel must choose to advocate for a position that will benefit some class members but harm other class members. That is the very definition of a conflict of interest. These existing conflicts will only multiply if this matter is permitted to proceed as a collective action. For these reasons, Plaintiff and his counsel cannot adequately represent the class whose interests Plaintiff purports to represent and, accordingly, his motion should be denied.

     **D.**     **Conditional Certification Is Not Warranted In The Instant Case Based On The Clear Lack Of Interest Among The Alleged Putative Class.**

Although collective actions are not subject to strict numerosity requirements, it is notable that courts routinely refuse to authorize notice when plaintiffs' showing evinces a minor percentage of the potential class. In considering motions for conditional certification, many courts require plaintiffs to demonstrate a third element: "that other employees desire to opt-in to this litigation." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F.Supp.2d 1272, 1276-77 (M.D. Ala. 2004) (citing *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. Fla. 1991)); *Thompson v. Speedway SuperAmerica, LLC.*, 2008 U.S. Dist. LEXIS 115050 (D. Minn. August 21, 2008) (denying conditional certification of "off the clock" claim); *West v. Border Foods, Inc.*, 2006 U.S. Dist. LEXIS 46506 (D. Minn. July 10, 2006) (denying certification where plaintiffs submitted evidence of alleged off-the-clock work for only 2.5% of the class); *Dybach*, 942 F.2d 1562 (certification denied where solicitation failed to come up with a significant number of allegedly similarly situated employees likely to assert claims).

Consequently, unless Plaintiff can demonstrate the requisite level of interest, the Court should deny this motion on that basis separate and apart from concerns regarding "similarly situated" or "manageability."

In the instant matter, Plaintiff received a solicitation from his current lawyers approximately one year ago, and many of the Opt-Ins received similar letters as part of an overall class solicitation around that same time period. (Pl. Dep. 77-79.) However, to date, instead of gaining traction, the case is losing interest even among the Opt-Ins. The case has dwindled to Plaintiff and eight Opt-Ins, as two Opt-Ins have either fully opted out or are in the process of doing so. Plaintiff's anemic showing stands in stark contrast to CPI's declarations from twenty-eight (28) current CPI technicians who unequivocally state that they have no interest in pursuing this case. Because there is a demonstrable lack of interest among the alleged putative class members, conditional certification should be denied for this additional reason as well.

### E. Considerations Of Fairness And Procedure As Well As Judicial Economy Support Denial Of Conditional Certification.

As explained above, Plaintiff is not similarly situated to the putative class, and the issues in this case are highly individualized. Consequently, this case cannot properly be tried by representative testimony. Under such circumstances, considerations of manageability, fairness, and judicial economy weigh heavily against certification. *See Margaret White v. Baptist Memorial Health Care Corp.*, 2011 U.S. Dist. LEXIS 52928 at *40 (W.D. Tenn. May 17, 2011) ("Because [the plaintiff] has not shown that the Opt-In Plaintiffs are similarly situated, there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the defendant] and manageability problems for the Court."); *see also Hoffman-LaRoche,* 493 U.S. 165, 170 (1989). "[W]here a collective action would not serve the interests of judicial economy, plaintiffs should not be permitted to request court-

supervised notice as a tool for drumming up business." *Robinson v. Dolgencorp, Inc.*, 2006 U.S. Dist. LEXIS 85471, at *25 (M.D. Fla. Nov. 13, 2006). Thus, this factor also supports denial of conditional certification.

## IV. THE CONTENT AND FORM OF THE PROPOSED NOTICE IS INAPPROPRIATE

While Defendant objects to the content and form of Plaintiff's proposed Notice, briefing its objection at this time would be premature. Instead, Defendant respectfully requests that, in the event that the Court decides to conditionally certify a class, the Court order that the parties confer in an attempt to agree upon the content and form of notice as well as an appropriate manner of distributing notice, and, to the extent that the parties cannot agree on such matters, that they be given an opportunity to brief any outstanding issues at a later time for resolution by the Court.

Dated: January 22, 2013

*/s/ Stephen D. Dellinger*
Stephen D. Dellinger, Bar No. 16609
sdellinger@littler.com
Littler Mendelson, P.C.
Bank Of America Corporate Center
100 North Tryon Street, Suite 4150
Charlotte, North Carolina 28202
Telephone: 704.972.7000
Facsimile: 704.333.4005

Joseph G. Schmitt - admitted pro hac vice
jschmitt@nilanjohnson.com
NILAN JOHNSON LEWIS PA
120 South Sixth Street, Suite 400
Minneapolis, MN 55402
Telephone: 612.305.7500
Facsimile: 612.305.7501

*Attorneys for Defendant*
*CPI Security Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2013, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to the

following parties:

Rachahhana T. Srey, Esq.
Email: srey@nka.com
Paul J. Lukas, Esq.
Email: lukas@nka.com
NICHOLS KASTER, PLLP
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870

*Attorneys for Plaintiff*

Seth R. Cohen, Esq.
Email: ssjrclaw@earthlink.net
Smith, James, Rowlett & Cohen, L.L.P.
101 South Elm Street, Suite 310
Greensboro, NC 27402
Telephone: (336) 274-2992
Facsimile: (336) 274-8490

*Attorneys for Plaintiff and the Similarly Situated*

**/s/ Stephen D. Dellinger**
Stephen D. Dellinger
N.C. State Bar No. 16609
*sdellinger@littler.com*
LITTLER MENDELSON, P.C.
Bank of America Corporate Center
100 North Tryon Street, Suite 4150
Charlotte, North Carolina 28202
*Telephone*: 704.972.7000
*Facsimile*: 704.333.4005

*Attorneys for Defendant*